# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2707

_____

Jeffrey Barstad, et al.,      *
     *
        Appellants,      *    Appeal from United States
     *    District Court for the
     v.      *    District of Minnesota.
     *
Murray County, et al.,      *
     *
        Appellees.      *

_____

Submitted: May 9, 2005
Filed: August 26, 2005

_____

Before BENTON, LAY, and FAGG, Circuit Judges.

_____

BENTON, Circuit Judge.

Jeffrey D., Dianne L., and Jerome Barstad ("the Barstads") sued Karen Onken and Murray County ("the County"). The Barstads alleged a denial of equal protection, conspiracy to violate civil rights, and interference with prospective contracts, in violation of 42 U.S.C. §§ 1983, 1985(3), 1986, and state law. The district court[1] granted summary judgment to the County. The Barstads appeal. Jurisdiction being proper under 28 U.S.C. § 1291, this court affirms.

_____

[1] The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

I.

The Barstads moved to amend the complaint on March 1, 2004, almost two months after the deadline in the amended-final-pretrial-scheduling order. *See* **Fed. R. Civ. P. 15(a)**. The County did not oppose the Barstads dropping all individual defendants – except Onken – but did object to adding new equal protection claims. *See* **Fed. R. Civ. P. 21**. The district court ruled that the Barstads did not show good cause for adding the new claims. *See* **Fed. R. Civ. P. 16(b)**. The Barstads assert an abuse of discretion by the denial of the motion. *See* ***Zenith Radio Corp. v. Hazeltine Research, Inc.***, 401 U.S. 321, 330 (1971).

As good cause, the Barstads state they obtained new counsel, and the County did not comply with discovery requests, delaying depositions. The Barstads obtained new counsel in April 2003. The deadline for motions to amend the complaint was December 1, 2002, and for nondispositive motions was January 6, 2004. The district court properly decided that the Barstads' counsel had sufficient time (eight months) to request an amendment to the scheduling order. While the County did not timely comply with some discovery requests, the Barstads knew of the claims they sought to add when they filed the original complaint in July 2002. Also, the claims did not hinge on the concluding depositions. The district court did not abuse its discretion in denying leave to amend. *See* ***In re Milk Products Antitrust Litigation,*** 195 F.3d 430, 437-38 (8th Cir. 1999).

II.

This court reviews de novo a grant of summary judgment, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party. *See* ***Walsh v. United States***, 31 F.3d 696, 698 (8th Cir. 1994). Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* **Fed. R. Civ. P. 56(c)**; ***Celotex Corp.***

*v. Catrett*, 477 U.S. 317, 322-23 (1986). The district court should not grant summary judgment if a reasonable jury could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This court may affirm summary judgment for any reason supported by the record, even if it differs from the rationale of the district court. *See Brandt v. Davis,* 191 F.3d 887, 891 (8th Cir. 1999).

A.

Onken began working for the County in 1992, becoming zoning administrator in 2000. During this time, the Barstads owned five properties in the County: lot seven on Valhalla Island; Edgewater Bay Subdivision; Autumn Blaze Estates; Edgewater Bay Campground; and Shorewood Estates. The Barstads assert that they were denied equal protection of the law because Onken and the County denied them some Planned Unit Development (PUD) approvals and Conditional Use Permits (CUPs).

The Equal Protection Clause requires that the government treat all similarly situated people alike. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Supreme Court recognizes an equal protection claim for discrimination against a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The purpose of a class-of-one claim is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* It is recognized law that a class-of-one claimant may prevail by showing "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.*; *see also Costello v. Mitchell Public School Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001).

Identifying the disparity in treatment is especially important in class-of-one cases. *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1213 (10th Cir. 2004). The

Barstads must establish that they were "'similarly situated' to other applicants for the license, permit, or other benefit being sought, particularly with respect to the same time period." *Anderson v. Douglas County*, 4 F.3d 574, 577 (8th Cir. 1993). The district court determined that the Barstads failed to prove they were intentionally treated differently from other similarly situated landowners. This court agrees.

i.

In 1972, the County zoned Valhalla Island "commercial-recreational." In 1982, the Island was re-zoned (although the parties dispute the uses allowed). At any rate, several campgrounds and restaurants continued to operate there. In 1996, Onken notified the Barstads that their miniature golf course may violate the zoning ordinance. The Island was again re-zoned, permitting the Barstads to keep the course without applying for a CUP. The Barstads allege intentionally different treatment, but offer no supporting evidence. At best the Barstads point to a public hearing, which Jeffrey Barstad attended, where the zoning commission discussed a public apology to Island landowners for the zoning confusion. Though the Barstads had received a notice, the commission was concerned for all landowners. The Barstads do not show they were treated differently from other Valhalla landowners.

The Barstads also assert that on the same Island, the County treated them differently regarding the conversion of a duplex into a motel. This claim is made only in the motion to amend, which was denied; thus, it is not before this court.

ii.

Before the Barstads could develop Autumn Blaze Estates into a residential subdivision, the County required that they obtain a feedlot variance and (on the recommendation of the County engineer) dedicate a strip of land for road expansion

and a bike path. The Barstads complain that the County did not require any other subdivision developer to get such a variance or dedicate land for similar purposes.

The Barstads fail to show they were intentionally treated differently from a similarly situated developer. First, all developers must obtain a variance when a feedlot has operated five years before, and within one mile of, a residential development. *See* **Minn. R. 7020.0350, sub. 1**. The Barstads do not identify a developer within one mile of a feedlot who was not required to get a variance. Additionally, developers in the County regularly must dedicate land for road expansions. Although the County has (apparently) not actually constructed the bike path, the Barstads must demonstrate that the County intentionally failed to take land for a bike path in a similar development. The Barstads never identified such a similar property. *See **Bituminous Materials, Inc. v. Rice County, Minn.***, 126 F.3d 1068, 1071-72 (8th Cir. 1997). They do not show they were intentionally treated differently from other similar landowners, as to Autumn Blaze Estates.

iii.

In 1991, the County approved the Barstads' preliminary and final plats for construction at Edgewater Bay Subdivision. They began selling lots. The County later stated it would not issue building permits until the Barstads installed a cluster septic system, or raised the land above the flood plain. (Of the 30 lots in the Subdivision, 14 were below the flood plain.) The County did not believe that a standard septic system could support the lots due to the low flood plain. A cluster system requires a drainage field, the size of which depends on the number of houses using the system.

The County required 1,500 square feet for the drainage field at the Subdivision. Anticipating additional development, the Barstads' contractor installed a 3,000-square-feet system – without recording the system, or obtaining County

approval.  In 2001, the Barstads sought a permit to build more houses, which the County rejected believing that the drainage field was the original size of 1,500 square feet.  By an inspection, the County discovered the 3,000-square-feet system.  The County then permitted construction without requiring additional fields.

The County also denied the building permits due to flood elevation concerns. In 1999, the Barstads had hired a local surveyor to measure hub elevations, but in 2001, he could not remember the sites where he measured the elevations.  Before issuing building permits, the County hired the same surveyor to re-measure the elevations.

The Barstads received a CUP for campers on three lots at the Subdivision. They planted grass and trees, dug two wells, and installed electrical services.  A County zoning official – not Onken – thought there was not enough activity and suggested the County revoke the CUP.  Onken signed and sent a letter to the Barstads revoking the CUP, but the County Attorney re-instated it after determining there was sufficient activity.

The Barstads argue they were the only landowners required to install a cluster system, that they were wrongfully denied construction permits, and that the County wrongfully revoked the CUP.  First, the Barstads point to no other landowner whose lots were below the flood plain (requiring a cluster system).  As for the construction permits, the Barstads have not demonstrated that the County inconsistently issued the permits – that either a builder with an insufficient drainage field got a permit, or they were the only builders with adequate drainage wrongfully denied a permit.[2]  Because

---

[2]While discussing the size of the drainage field, Jeffrey Barstad made an obscene gesture to Onken.  When he later applied for the permit at issue, Onken refused to grant it until he apologized. Jeffrey Barstad apologized minutes later and received the permit. Onken was verbally reprimanded for requiring that he apologize. Because the Barstads seek to impose liability on a local government, they must show

the Barstads had not informed the County of the size of their field (which was not properly recorded or approved), they cannot show that the County acted wrongfully in initially denying the permit. Moreover, there is no evidence that the Barstads were the only landowners who had to await for updated flood-elevation measurements before receiving a building permit. Finally, although the County mistakenly believed there was insufficient activity at the Subdivision, the Barstads fail to prove that they were the only landowner whose CUP was mistakenly revoked. *See **GJR Invs., Inc. v. County of Escambia, Fla.***, 132 F.3d 1359, 1367-68 (11th Cir. 1998).

iv.

In 1997, the Barstads requested permission to construct 65 units at Edgewater Bay Campground. The County informed them they needed an Environmental Assessment Worksheet (EAW) and a CUP approval because they proposed more than 50 sites. After the Barstads completed the EAW, Onken signed and sent a letter stating that the density code – a comparison of the number of units to the distance from the lake – did not permit 65 units. The County limited the Barstads to 36 units.

The Barstads complain that only their Campground was required to complete an EAW. However, they fail to show other developers who proposed to build more than 50 units in one project. An EAW is required only when more than 50 units are being built at a time. *See* **Minn R. 4410.4300, sub. 20**. Moreover, a density calculation is required for any CUP application in the Shoreland Management District (which includes the Campground). According to the record, other surrounding campsites had existed for decades and (at most) were expanding an existing use. The Barstads' campground was completely new. Finally, the Barstads concede that all

---

that the injury was not inflicted solely by the employee but was the official policy. *See **Monell v. Dep't of Soc. Servs.***, 436 U.S. 658, 694 (1978). The circumstances of the gesture/apology incident show that Onken's action was not the official policy of the County.

campsites had a density calculation, but assert that the County applied the density formula differently to them. They provide no evidence to support this assertion.

The Barstads fail to demonstrate that the County intentionally treated them differently from other similar landowners in the Shoreland Management District.

v.

After the Barstads purchased Shorewood Estates, Onken informed them: the lots were in a flood plain that could not be filled; they had no right of access to the lake; their proposed RV campground would diminish the value of surrounding land; and they had no plans for sewer, traffic and parking. The County denied their request for a CUP, but granted permission for a trailer and one septic tank. The Barstads sold the property to Mike Onken (a second cousin to the ex-husband of defendant Onken). Six months later Mike Onken drained and filled the lots, and built a dock and two cabins. The district court found that no other property owner or developer was granted a CUP to develop an RV campground in the Shoreland district over opposition of neighbors and the Minnesota Department of Natural Resources.

The Barstads argue that they and Mike Onken are similarly situated because they sought the same benefits for the same parcel of land. The district court found no evidence that the County granted Mike Onken permission to perform any work for which the Barstads were denied a permit.

After a de novo review, this court agrees with the district court's conclusions as to Shorewood Estates.

vi.

The Barstads assert at length that Onken's "vindictive action, illegal animus, and ill-will" modifies the need to show intentional treatment different from that of

similarly situated landowners. *See Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995). This is not what the Supreme Court says in the *Olech* case. *Olech*, 528 U.S. at 564. It requires that the plaintiff must be "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* Moreover, Justice Breyer's concurrence in *Olech* would require an "extra" or "added" factor like the Barstads assert – in addition to what the Court requires. *Id.* at 565 (Breyer, J., concurring). Therefore, if the Barstads cannot meet the *Olech* test, they cannot satisfy the standard in the concurrence.

The Barstads have not demonstrated that they were intentionally treated differently from similarly situated landowners and developers for Valhalla Island, Edgewater Bay Subdivision, Autumn Blaze Estates, Edgewater Bay Campground, or Shorewood Estates. *See Silver v. Franklin Township Bd. of Zoning Appeals,* 966 F.2d 1031, 1036-37 (6th Cir. 1992).

B.

In order to show a civil rights conspiracy under 42 U.S.C. § 1985(3), the Barstads must prove: (1) the defendants conspired, (2) with the intent to deprive them, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) that they or their property were injured, or they were deprived of exercising any right or privilege of a citizen of the United States. *See Larson v. Miller,* 76 F.3d 1446, 1454 (8th Cir. 1996).

The Barstads fail to demonstrate the first prong, the existence of a conspiracy. A conspiracy claim requires evidence of specific facts that show a "meeting of minds" among conspirators. *See Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988). A meeting of the minds requires at least two persons. *See Rotermund v. U. S. Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir. 1973). Because a corporation and its agents are

a single person in the eyes of the law, a corporation cannot conspire with itself. *See Cross v. General Motors Corp.,* 721 F.2d 1152, 1156 (8th Cir. 1983). A government entity cannot conspire with itself either. *See Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985). An exception arises when the agents were, at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit. *See Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir. 1987). Because the Barstads pleaded only that Onken "acted in the course and scope of [her] employment," they fail to demonstrate the existence of a conspiracy. *Green v. Associated Milk Producers, Inc.*, 692 F.2d 115, 1156-57 (8th Cir. 1982).

Finally, the Barstads assert the County failed to act with reasonable diligence in preventing the conspiracy. *See* **42 U.S.C. § 1986**. This claim must be predicated upon a valid § 1985 claim. *See Jensen v. Henderson*, 315 F.3d 854, 863 (8th Cir. 2002). Because the Barstads' § 1985 claim fails, the § 1986 claim was also properly dismissed.

C.

The Barstads complain that the district court erroneously dismissed their supplemental state law claim, interference with prospective contracts. A federal district court has discretion to decline jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988). This court finds no abuse of discretion in this case. *See Regions Bank v. J.R. Oil Co., LLC,* 387 F.3d 721, 732 (8th Cir. 2004).

* * *

The judgment of the district court is affirmed.

_____